**AERO MAYFLOWER TRANSIT COMPANY, INC., et al., Petitioners,**

v.

**INTERSTATE COMMERCE COMMISSION and the United States of America, Respondents,**

and

**Bekins Van Lines Company, Intervening Respondents.**

No. 81–2772.

United States Court of Appeals, Seventh Circuit.

Argued June 8, 1982.

Decided Feb. 11, 1983.

Rehearing Denied May 4, 1983.

Alan Wohlstetter, Washington, D.C., for petitioners.

---

Ellen D. Hanson, I.C.C., Washington, D.C., for respondents.

Before CUDAHY and ESCHBACH, Circuit Judges, and EAST,* Senior District Judge.

ESCHBACH, Circuit Judge.

In this case we must decide whether the Interstate Commerce Commission ("ICC" or "Commission") abused its discretion in denying the petitioners standing to protest a motor carrier's application seeking authority to transport household goods. We hold that the ICC did abuse its discretion; therefore we vacate the order granting the application and we remand the case to the Commission for proceedings consistent with this opinion.

## I. THE ADMINISTRATIVE PROCESS

Bekins Van Lines Company ("Bekins") applied to the ICC for authority to transport household goods nationwide under contracts with a specific shipper—Cutler-Williams Incorporated of Dallas, Texas. Bekins possesses *common* carrier authority but it wants a license to enter into unique contracts with Cutler-Williams to move the household goods of employees transferred by Cutler-Williams. Presumably the rates and terms of such contracts would be different from the rates and terms that Bekins offers under its common carrier authority.

Primarily two sections of the Motor Carrier Act of 1980, Pub.L. No. 96–296, 94 Stat. 793 (1980), define the criteria that an applicant seeking authority to transport goods as a contract carrier (as opposed to a common carrier) must satisfy. First, the applicant must meet the Act's definition of "motor contract carrier," which is in relevant part:

a person providing motor vehicle transportation of property for compensation under continuing agreements with one or more persons—

(i) by assigning motor vehicles for a continuing period of time for the exclusive use of each such person;

or

(ii) designed to meet the distinct needs of each such person.

49 U.S.C. § 10102(13)(B). Second, the applicant must be:

fit, willing, and able—

(A) to provide the transportation or service to be authorized by the permit; and

(B) to comply with [the Interstate Commerce Act] and [the] regulations of the Commission.

49 U.S.C. § 10923(a)(1).

The petitioners, four motor common carriers holding permits to transport household goods nationwide, filed protests to Bekins' application. They contended that Bekins' proposed service for Cutler-Williams does not constitute "motor contract carrier" service as defined in 49 U.S.C. § 10102(13)(B). Moreover, they contended that granting Bekins' application would be inconsistent with the public interest because it would permit Bekins to unjustly discriminate between Cutler-Williams and similarly-situated shippers. Over these protests, a review board of the ICC concluded that Bekins' proposed service for Cutler-Williams does constitute contract carrier service and that granting the application is consistent with the public interest.

The petitioners appealed the review board's decision to the full Commission. While that appeal was pending, the petitioners acquired some documents belonging to Bekins that allegedly demonstrate that Bekins' proposed service for Cutler-Williams does not meet the Act's definition of contract carrier service. These documents, accompanied by arguments of the petitioners, were presented to the Commission. On October 5, 1981, the ICC issued its decision granting Bekins' application for contract carrier authority.[1] *See* 132 M.C.C. 726 (1981). In its decision the ICC did not consider the petitioners' arguments or evi-

---

* The Honorable William G. East, Senior District Judge of the District of Oregon, sitting by designation.

1. The ICC's review board believed that Bekins' proposed service qualifies as "motor contract

dence because it concluded that the petitioners lacked standing to challenge the application. The petitioners seek judicial review of the ICC decision in this court pursuant to 28 U.S.C. §§ 2321, 2342.

## II. EXPLAINING THE SHIFT IN POLICY

Since the enactment of the Motor Carrier Act of 1980, these petitioners have protested hundreds of applications seeking authority to transport household goods as motor contract carriers. This is the first case, however, in which the ICC declined to consider the merits of a protest on the ground that the petitioners lacked standing. Indeed, in this very case neither the review board of the ICC nor the applicant (Bekins) hinted that the petitioners were improper protestants. Within the boundaries of its statutory mandate, the Commission is free to modify the standing requirements of protestants. We believe, however, that the ICC's failure to explain its unanticipated adjustment of protest standards in this case amounts to an abuse of discretion. *See generally* 5 U.S.C. § 706 (reviewing court must set aside an agency action found to be an abuse of discretion).

Supporting its decision, the ICC stated that the petitioners failed to satisfy the statutory qualifications for protesting an application for contract carrier authority. These requirements, set forth in 49 U.S.C. § 10923(b)(4), state that:

No motor carrier of property may protest an application to provide transportation as a motor contract carrier of property filed under this section unless—

(A)(i) it possesses authority to handle, in whole or in part the traffic for which authority is applied;

(ii) it is willing and able to provide service that meets the reasonable needs of the shippers involved; and

(iii) it has performed service within the scope of the application during the previous 12-month period or has, ac-

tively in good faith, solicited service within the scope of the application during such period;

(B) it has pending before the Commission an application filed prior in time to the application being considered for substantially the same traffic; or

(C) the Commission grants leave to intervene upon a showing of other interests that are not contrary to the transportation policy set forth in section 10101(a) of this title.

Because the petitioners did not have pending an application to serve Cutler-Williams as contract carriers, the ICC considered subsections (A) and (C) of this provision. With respect to the requirements of subsection (A), the ICC noted that the petitioners possess the authority and ability to handle the shipping needs of Cutler-Williams. However the ICC concluded that the petitioners failed to submit evidence that they had performed service for or actively solicited service from Cutler-Williams within the previous twelve months. The ICC also concluded that Bekins' application did not present novel or important issues warranting the Commission to grant the petitioners leave to intervene under the permissive intervention provision of subsection (C).

Standing by itself, the ICC's decision may appear to be sufficiently justified. Juxtaposed against the petitioners' previous protests, however, we are unable to discern why the ICC permitted the petitioners to protest previous contract carrier applications but not the application of Bekins to serve Cutler-Williams. The protest requirements of § 10923(b)(4) existed at the times of the previous cases but were not invoked to deny the petitioners' protests. The ICC may repudiate or narrow protest standing requirements, but the Commission must explain its change of direction so that the reviewing court may understand the basis of the change and judge the consistency of the revision with the ICC's statutory man-

carrier" service because Bekins "will assign motor vehicles for a continuing period of time for the exclusive use of" Cutler-Williams, 49 U.S.C. § 10102(13)(B)(i). The Commission disagreed but concluded that the service qualifies

as contract carriage under § 10102(13)(B)(ii) because Bekins promises to provide "on-the-spot" service designed to meet the distinct needs of Cutler-Williams.

date. *See Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade,* 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973); *Hilt Truck Line, Inc. v. United States,* 548 F.2d 214, 216 (7th Cir.1977) (ICC "cannot disregard its own precedent but must reasonably explain an alteration of policy.").

Perhaps our judgment would be different if § 10923(b)(4) unambiguously mandated the ICC's decision in this case. If such were the case, we might be able to infer an explanation of the ICC's action in this case: for the first time, the Commission decided to abide by its mandate and to apply § 10923(b)(4), a provision designed to eliminate "frivolous appeals," 126 Cong.Rec. S7685 (daily ed. June 20, 1980) (statement of Sen. Cannon). Section 10923(b)(4), however, does not unquestionably compel the ICC's decision, and, in fact, previous statements of the Commission indicate that this case represents a change in the ICC's interpretation of the law, not a decision finally to follow the statute.

In 1978 the ICC revised its standards under which it would permit protests to motor carrier applications. *See* 43 Fed.Reg. 50908 (1978). These revisions were made to eliminate many "frivolous protests" and to permit more cases to be handled unopposed. *Motor Carrier Application Procedures,* 42 Fed.Reg. 59985, 59987 (1977). The ICC allowed protests under these regulations if the protestor evidenced a real interest in the traffic that was the subject of the application. Solicitation of the business of those shippers who supported a motor carrier's application was evidence of an interest in the proceedings that justified standing to protest. *See* 43 Fed.Reg. at 50909. The ICC noted, however, that solicitation of business by members of the motor carrier industry varies in its methods. The Commission stated:

> We recognize that with certain types of carriers, direct solicitation [through personal contact] is not practical and the industry practice is to employ general

advertising. For example, motor bus carriers, *household goods carriers,* and others similarly situated which hold themselves out to the general public will engage principally in less direct forms of solicitations, such as newspaper advertisements, brochures, yellow pages, television and radio commercials. In evaluating petitions to intervene [protest] based on solicitation, this circumstance will be taken into account.

*Id.* (emphasis added).

The protest standing requirements of 49 U.S.C. § 10923, enacted as § 10 of the Motor Carrier Act of 1980, are similar to the regulations promulgated by the ICC in 1978. As noted above, § 10923(b)(4) states that a motor carrier may not protest an application for contract carrier authority unless it possesses the authority and ability to meet the needs of the shipper involved and has performed service for or *actively solicited* service from the shipper within the last twelve months. The concept of solicitation, therefore, continues to play a critical role in protest standing requirements. One might have expected that the ICC also would continue to recognize that it is "not practical" for household goods carriers to solicit business through personal contacts, and that "less direct forms of solicitation ... will be taken into account." 43 Fed. Reg. at 50909. In this case, however, without explanation the ICC decided that the petitioners had not "actively solicited" Cutler-Williams' business as those terms are used in 49 U.S.C. § 10923(b)(4)(A).[2]

This brief history of the ICC's standing requirements demonstrates that the ICC's decision denying the petitioners standing to protest Bekins' application did not follow necessarily from the mandate of § 19023(b)(4). The concept of solicitation, as employed in that section, is not self-defining. The Commission's decision, however, reveals no hint as to the type of solicitation that will suffice to warrant standing. We do not even know whether the ICC has acted arbitrarily or has repudi-

---

**2.** The Commission's regulations promulgated pursuant to the Motor Carrier Act of 1980 merely paraphrase the protest requirements of § 10923(b)(4). *See* 49 C.F.R. § 1100.252

(1981). The regulations do not purport to explain the type of solicitation that will warrant standing to protest applications for contract carrier authority.

ated its view that "less direct forms of solicitations, such as newspaper advertisements ... will be taken into account." 43 Fed.Reg. at 50909. A valid interpretation of § 10923(b)(4) might permit the ICC to deny standing to the petitioners in this case; however, we cannot affirm the order under review without knowing what the ICC's interpretation is.

### III. INADEQUATE NOTICE

■ The ICC's decision to deny standing to the petitioners understandably came as a surprise. The petitioners naturally assumed that the facts that justified standing in the past, continued to warrant standing. Indeed, the Commission gave no notice that it intended to narrow the standing requirements applicable to those who want to protest motor contract carrier applications.[3] Given the absence of notice, it is evident that the petitioners did not have a fair opportunity to establish their qualifications as proper protestants. We believe that the unfairness inherent in this situation renders the ICC's order an abuse of discretion.

Courts have commonly held that when an agency wants to change a controlling standard and apply it in an adjudicatory setting, parties before the agency must be given notice and an opportunity to introduce evidence bearing on the new standard. *See, e.g., Hatch v. Federal Energy Regulatory Commission,* 654 F.2d 825, 835 (D.C.Cir. 1981) (citing many cases to the same effect). Indeed, the ICC itself has stated that, "in fairness, standards should not be changed without due notice." *General Increase-Transcontinental,* 319 I.C.C. 792, 803 (1963). To be sure, there may be cases in which compelling interests justify applying a new rule retroactively despite the reliance of a party on an old rule. *See Cleveland-Cliffs Iron Co. v. I.C.C.,* 664 F.2d 568, 576 (6th Cir.1981). The ICC, however, has not contended that such interests exist in this case.

Notice of the ICC's intent to narrow the protest standing requirements could have affected the petitioners' efforts in several ways. First, they could have suggested

their view of the proper interpretation of the solicitation requirement of § 10923(b)(4)(A). Concomitantly, they might have produced more detailed evidence of efforts to solicit the business of Cutler-Williams. Finally, they might have sought leave to intervene pursuant to § 10923(b)(4)(C)—the subsection allowing standing to protest "upon a showing of other interests." The petitioners must be given a fair chance to prove that they have sufficient interests in Bekins' application to warrant having their protest considered on the merits.

### IV. THE REMAND

■ The ICC's decision granting Bekins' application for motor contract carrier authority was predicated, in part, on its decision denying the petitioners standing to protest. Because the Commission abused its discretion in the manner in which it denied standing, the order granting Bekins' application must be vacated. *See S.C. Loveland Co., Inc. v. United States,* 534 F.2d 958, 960 n. 1 (D.C.Cir.1976).

We emphasize that we are not ordering the ICC to grant the petitioners leave to intervene. Although the petitioners might readily qualify as "interested parties" entitled to intervene in agency adjudications under the provisions of the Administrative Procedure Act, 5 U.S.C. § 554(c), that section is superseded in motor contract carrier cases by the specific standing requirements of 49 U.S.C. § 10923(b)(4). The Commission is reminded, however, to interpret and apply the standing provisions of § 10923 (b)(4). Section 10925(e), which provides a procedure whereby a party may test whether a carrier operating under a *contract* carrier permit is, in fact, operating as a *common* carrier, is not exclusive of § 10923(b)(4). *See generally S.C. Loveland Co., Inc. v. United States,* 534 F.2d 958, 963 (D.C.Cir.1976) (there may be different burdens associated with trying to prevent the grant of an application and seeking to have such a grant revoked by the ICC). Thus a party satisfying the standing requirements of § 10923(b)(4) is free to urge the ICC to

---

**3.** The Commission's regulations provided no    notice. *See supra* note 2.

deny a request for contract carrier authority on the basis that the applicant is offering only common carrier services.[4]

V.

The ICC's order granting Bekins' application for contract carrier authority is vacated. The case is remanded to the Commission with instructions to give notice of the type of solicitation that it considers adequate to satisfy the protest standing requirements of § 10923(b)(4)(A); the petitioners must then be given an opportunity to prove that they are qualified protestants.

---

**4.** We need not decide in this case whether a carrier validly denied standing to protest an application for contract carrier authority may yet be entitled to seek judicial review of a Commission order granting such authority.